IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DOMINICK MAIDA, ET AL.                                                    PLAINTIFFS

vs.                                      NO. 4:07CV001151 BSM

SAMANTHA SHERMAN, ET AL.                                          DEFENDANTS

### ORDER

Before the court is plaintiffs' motion for summary judgment [Doc. No. 73].  For the

reasons set forth below, the motion is granted

## I.  INTRODUCTION

This case reminds the court of the song, "Papa Was a Rolling Stone," which was

written by Norman Whitfield and Barrett Strong and sung by the Temptations on the Motown

record label.  In that song, there is a verse that says, "Heard some talk about papa doing some

store front preaching.  Talking about saving souls and all the time leeching.  Dealing in debt

and stealing in the name of the Lord."  It is regretfully true, but the defendants are little more

than thieves, who deal in debt and steal in the name of the Lord.

## II.  PROCEDURAL BACKGROUND

Plaintiffs filed this complaint on November 29, 2007, alleging sixteen causes of action

including fraud, violation of the Racketeer Influenced and Corruption Organizations Act

(RICO), and violations of several state and federal securities and consumer protection

statutes. On January 22, 2008, defendant Samantha Sherman, who was proceeding *pro se*,

filed an answer on behalf of herself, and defendants James Sherman, Joe Vincent II, the

Vision Group, Inc. and VGRT, Inc.  By order dated November 18, 2008, the court struck the answers of defendants James Sherman, Joe Vincent II, the Vision Group, Inc., and VGRT, because Samantha Sherman, who is not a lawyer, could not represent them.  The remaining defendants were given twenty days to file an answer.  They failed to do so and they are in default.

On May 29, 2009, the court granted plaintiffs' fourth motion for discovery sanctions, and due to Samantha Sherman's constant failure to comply with the court's orders, struck the denials in paragraphs 36, 74, and 76 in Samantha Sherman's answer.

Only Samantha Sherman and Jerry Johnson (Johnson) have answered the complaint and both are now represented by counsel.  Samantha Sherman has responded to the summary judgment motion claiming she can neither admit nor deny plaintiffs' statement of undisputed facts because of the risk of potential prosecution.  Johnson asked for an extension of time to respond to the summary judgment motion but  failed to file his response in the time allowed. Johnson filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Eastern District of Arkansas on July 20, 2009. The Bankruptcy Court relieved plaintiffs from the automatic stay on July 30, 2009.  Johnson filed his response to the motion for summary judgment on August 4, 2009, contending that it is timely because the automatic stay afforded him additional time by virtue of the bankruptcy petition.  Johnson, like Samantha Sherman, has exercised his rights under the Fifth Amendment to the United States Constitution and neither admits nor denies plaintiffs' statement of undisputed facts.

## III.  SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law."  *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558(8th Cir. 2008)).

The moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (citations and internal quotation omitted).

"Moreover, 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'  [Plaintiff as the non-movant] must demonstrate a genuine issue of material fact, that is a dispute that might 'affect the outcome of the suit under the governing law,' so that 'a reasonable jury could return a verdict

for the nonmoving party." *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1028-29 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1985)).

In considering a motion for summary judgment, the court views the evidence and draws all reasonable inference in the light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). However, the plain language of Rule 56 mandates the entry of summary judgment against a non-moving party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## IV.  FACTUAL BACKGROUND

The plaintiffs' statement of undisputed facts [Doc. No. 75] has not been disputed by the defendants.  The following factual background is taken from plaintiffs' statement of undisputed facts and the complaint.

A.    <u>Introduction</u>

Plaintiffs, Dominick and Dorthy Marie Maida (collectively, the "Maidas"), are married and own plaintiff Maida, Inc., an Arkansas corporation. Defendants, Samantha Sherman and James Sherman (collectively, the "Shermans"), are married and  reside in Pulaski County, Arkansas. Defendant Joe Vincent, II ("Vincent") is the son of Samantha Sherman.  At all relevant times, the Shermans and Vincent were, or held  themselves out as officers,

controlling persons and/or principals of TheVisionGrp., Inc. and of VGRT, Inc.    Defendant Johnson has resided in Pulaski County, Arkansas and held himself out as an officer, and was held out by the codefendants as an officer of TheVisionGrp., Inc.  Johnson was also the "Operations Manager" and  supervisory principal of TheVisionGrp., Inc.

Defendant TheVisionGrp, Inc. d/b/a The Vision Group and VisionGrp ("Vision Group") is a for-profit corporation organized and operating under the laws of the State of Arkansas.  It maintained a principal place of business in Pulaski County, Arkansas, but its charter has been suspended by the Arkansas Secretary of State.

Defendant VGRT, Inc. ("VGRT") d/b/a VGRT, LLC and Vision Group REIT, Inc. is a for-profit corporation held out by the remaining defendants to be managing a Real Estate Investment Trust, which was organized and operating under the laws of the State of Nevada, and which had maintained a principal place of business in Pulaski County, Arkansas.  VGRT is not licensed to do business in the State of Arkansas and has not appointed an agent for service in the State of Arkansas.

The individual defendants have held themselves or the companies of which they were directors, officers, principals and shareholders, as capable of performing credit repair, as mortgage brokers, investment advisors, stock promoters, real estate brokers or agents, leasing agents, property managers, and insurance brokers.  The defendants, however, were neither (1) licensed real estate agents or brokers, (2) registered with the Securities and Exchange Commission pursuant to 15 U.S.C. § 80a-29 despite acting as investment advisors, (3)

registered with the Securities and Exchange Commission pursuant to 15 U.S.C. § 80a-24 and

in the business of selling purported "securities" as defined at 15 U.S.C. § 80b-2(11), nor (4)

licensed or bonded credit repair agencies as defined at Ark. Code Ann. § 4-91-106(a)(1), or

otherwise a   non-profit credit repair agencies as defined at Ark. Code Ann. §

4-91-102(1)(b)(iv).

In 2005-2006, defendants created promotional literature holding Vision Group and

VGRT out as a Christian-based "member-based organization that utilizes a network of

companies…[that]…has developed a financial wellness system that allows us to transform

the lives of our members through the application of financial  principals [sic.] and

fundamentals."

B.   Credit Repair Program

In 2005-2006, the individual defendants, through Vision Group, held themselves out

as capable of "repairing" broken credit.  The individual defendants represented that they

could perform credit repair and related services.  The individual defendants gave public

seminars in churches, hotels and educational facilities, in Texas, Arkansas, Mississippi, and

Tennessee.  In early 2005, the Shermans and Johnson gave a public seminar at Pulaski

Technical College in North Little Rock concerning "credit repair" administered by Vision

Group which Dorthy Maida attended.

.    The Shermans and Johnson represented that, by following this program, they had

improved their credit scores.  They stated that they had received many personal benefits from

the credit repair program, even to the extent they could obtain zero interest loans and receive other favorable terms in their own cost of borrowing. The Shermans and Johnson also represented that they could remove negative credit references so as to reduce the cost of future credit, and could (a) remove bankruptcies from credit reports; (b) get a credit score high enough such that the participants could receive 0% interest credit cards; and (c) using their program, receive vehicle loans with $0 down and 0% interest on account of their improved credit scores. The seminar was one of several given by defendants in an effort to bring participants into their "program," which allowed defendants to gather private financial details of the "participants."

On the basis of defendants' representations, the Maidas met personally with Samantha Sherman and her assistant at the Vision headquarters around September 20, 2005, to sign up for defendants' credit repair program. In that meeting, Ms. Sherman made representations similar to those made at the Pulaski Tech seminar. The Maidas filled out a credit report request, and paid defendants $1,698 in program joining fees, and $40 for credit check expenses. The Maidas also provided to defendants their Social Security numbers and authorized defendants to further research plaintiffs' financial histories and profile. Nowhere in the Vision Group Credit Repair literature was the "participant" given notice of any right to cancel.

Since the Maidas paid the program fees, defendants have made no material efforts toward repairing the Maidas's credit and no credit score improvement has occurred.

Defendants did not remove any specific negative credit items.   To the contrary, as a result of the late payments on the Marianna House (see discussion below), Dominick Maida's credit score has gotten significantly worse.

At the time that Samantha Sherman, James Sherman and Jerry Johnson made the statements described above pertaining to the Credit Repair Program, those statements  were false and known to be so by defendants.   At  no time did defendants actually perform according to their representations concerning the Credit Repair program.

C.       $25k Investor Program

After signing up for the credit repair program and in the course of discussions with each of the defendants, the Maidas were offered the chance to "invest" with the Vision Group in a real estate investment membership organization.  Defendants represented to plaintiffs that this organization was (a) profitable for the participants; (b) a further vehicle to improve credit ratings; and (c) an opportunity to help others with credit  problems. Johnson and Samantha Sherman met with the Maidas before the Maidas invested with Vision Group and guaranteed ten percent annual returns on their investment.

Defendants presented the Maidas with written materials purporting to outline the "$25k Investor Program" as it was referred to by defendants. According to the program's bylaws, and other written material, investors in the program can earn income from three sources: (a) by investing $25,000, the investor would receive income from the investment properties and joint venture contracts; (b) by referring and servicing one other commissionable investor, the

investor would receive a commission; and (c) by finding real property for potential acquisition, and causing several specified analytical documents to be drawn up with a goal of acquiring that property, the investor would receive payment if a net profit is realized from the property.

The written material detailing the "$25k Investment Program" refers to an "investor" on at least ten occasions, and based on defendants' proprietary "system," "guarantees" a return of "10% annually."  The document further states as follows: "Should the investor request a withdrawal of funds he/she must wait until 90 days after the start date to receive a refund of their investment dollars, and the undersigned promises to pay to the order of the investor the sum *representing* a  10% pro-rata return annually on  your investment for that period after 90 the days  [sic.]." [Emphasis in original].

Relying on defendants' statements, plaintiffs borrowed more money, using real property in Fort Smith Arkansas (the "Ft. Smith House") as collateral, so that they could buy into the "$25k Investor Program."  The investment contract is attached as Exhibit "D" to the complaint.  Vincent accepted plaintiffs' $25,000 check but does not remember what he did with the money.

The statements made by defendants in the course of enticing plaintiffs to invest in the "$25k Investor Program," specifically those oral statements made by the Shermans and Johnson, and the written statements made by Joe Vincent II on Vision Group's behalf, were knowingly false.

In August, 2007, the Maidas called Ms. Sherman, and requested, and then demanded, return of their investment, along with the guaranteed returns. Despite the demand, neither the Maidas nor Maida, Inc. has received (a) the guaranteed 10% returns, or (b) a return of their $25,000 investment. Though Ms. Sherman appears to admit that defendants owe plaintiffs these sums (less the closing costs for the Marianna house, see below), defendants have not returned plaintiffs' money.

Defendants deposited the Maidas's $25,000 check into the Vision Group corporate account held at Regions Bank. This is the same account into which defendants deposited the $1,698.00 in credit repair fees. The Maidas' funds were not placed into an investment or trust account.

The accounts into which plaintiffs' funds were deposited, the Regions Bank account which the funds from the closing on the "Marianna House" (see below) were deposited, and the Vision Group operating account at First Security Bank into which plaintiffs' funds from the additional $3,000 "VGRT, Inc. REIT" investment were deposited, (see below) each had as signatories at least three of the four individual defendants. The four individual defendants paid personal and business expenses from the accounts and then would share the remaining sums were on account in these accounts, in which each of the defendants received an equal share, except for Vincent.

There were at least six other investors in the Vision Group $25k Investment Program. None have received (a) the guaranteed 10% returns, or (b) a full return of their $25,000.00

investment.  Neither Vision Group nor The $25k Investor Program has ever been registered

with the Arkansas Securities Commissioner and neither Vision Group nor any of its staff has

ever been registered as an investment advisor pursuant to Arkansas law.

D.    VGRT, Inc. Real Estate Investment Trust

In December, 2006 each of the individual defendants  spoke with the Maidas as "$25k

Investors" concerning yet another real estate investment opportunity.  The Maidas were told

that the Vision group would create a real estate investment trust (REIT) called the VGRT, Inc.

REIT.  Defendants attempted to make the VGRT, Inc. REIT appear legitimate.  For example,

defendants created an "Offering Memorandum," which is attached as Exhibit G to the

Complaint. The Offering Memorandum contained many legally mandated caveats concerning

risk factors and lack of predictability of future performance, but indicates an anticipated 12%

- 15% annual return on the shareholders' investments.   The Offering Memorandum was

presented by the individual defendants to dozens of potential investors over the course of

several public and private presentations.  Defendants induced several other persons, in

addition to the Maidas, to invest in the VGRT REIT.

Dorthy Maida spoke with Samantha Sherman and Vincent on at least two occasions

about the VGRT REIT investment, during which the defendants addressed the REIT's

legitimacy, investment goals and expected profits.   Relying on the defendants'

representations, and the Offering Memorandum, the Maidas invested $3,000 in  the VGRT

REIT .

Both the Offering Memorandum and defendants' statements were materially incorrect and misleading.  Indeed, at the time defendants conveyed this information to plaintiffs, they knew the memorandum and their statements were false.

Neither Vision Group nor VGRT, Inc. has registered the VGRT REIT with the Arkansas Securities Commissioner.  Furthermore, VGRT, Inc. has never been licensed to do business in Arkansas by the Arkansas Secretary of State.  Neither VGRT, Inc., nor the individual defendants, has ever registered with the Arkansas Securities Commissioner as a broker or dealer selling securities in Arkansas.

Defendants had no reasonable basis on which to claim anticipated annual returns of 12-15% for the REIT.  The REIT has not produced any dividend returns, and has not paid out anything to its investors.  The $3,000 plaintiffs paid for their share of the REIT was not deposited into an investment or trust account, or even an account owned by VGRT, Inc.  Rather,  these funds were deposited by defendant Samantha Sherman into another account owned  by Vision Group, held at First Security Bank, over which the individual defendants (with the exception of James Sherman) had signatory authority, and which was handled in the same manner as the Regions Bank account detailed above. The deposit of these checks into the Vision Group account was directed personally by Samantha Sherman, who endorsed them into the Vision Group account.  The Maidas were not told of this diversion of their money.

E.      Marianna House

As a credit repair client and Vision Group $25k Investor, in June, 2006, defendants

offered plaintiffs other opportunities to further increase their credit score, and to help others. In one scheme, Vision Group arranged for the Maidas to finance and purchase housing and then convey the house to a third party in need of credit repair, who would take possession of the home pursuant to a rent-to-buy agreement.  According to the representations made by the individual defendants, specifically Johnson and Samantha Sherman, Vision Group would purchase the property and arrange financing, but plaintiffs were to take title and carry financing in their names. Then, for the period of one year, Vision Group would be obligated to pay the mortgage from rent paid by the third party, and maintain taxes and insurance. Defendants claimed that at the end of one year, the Vision Group would be obligated to obtain third-party financing for the tenant, and thereby enable the tenant's purchase of the house from the Maidas.  The Maidas were told that they would earn a profit of approximately three percent over the course of that year, and further increase their credit score as a result of participation in this program.

Samantha Sherman detailed certain arrangements that could be made regarding residential rental property at 107 Rodgers Street in Marianna, Arkansas ("the Marianna House").  Reverend Lee Eggerson was an existing tenant in the Marianna House, and Bobby Hoard, as trustee for the then-owner, desired to sell the Marianna House at a net price of $66,000. Vision Group, at the direction of defendants Johnson and Sherman, used the information from plaintiffs' credit repair file to fill out a loan application to purchase the house.  Defendants then forged plaintiffs' names to the application and mailed it.  Without

informing plaintiffs of their actions, defendants, specifically Johnson, requested that the seller inflate the price of the home by $18,000 to $84,000 and to pay the difference in the list price and inflated price to the Vision Group as a consulting fee. Hoard, acting as the seller, agreed.

. Defendants then obtained a second appraisal of the property, reflecting a value of $84,000, which was $12,000.00 higher than the previous appraisal. Neither plaintiff knew the identity of Bobby Hoard or of Lee Eggerson before the date they closed on the Marianna House. Relying on the various representations of defendants concerning the program outlined above, and specifically on the advice of defendants Johnson and the Shermans, and on the inflated appraisals, plaintiffs purchased and mortgaged the Marianna House.

A HUD-1 which contained the signature of plaintiffs was used in the closing. Neither plaintiff actually executed the HUD-1; rather those signatures were applied at the direction of defendants Samantha Sherman and Johnson and without plaintiffs' knowledge or consent. Neither plaintiff participated in the closing and neither was aware that the selling price of the house was inflated until after they received the closing documents after closing. Neither plaintiff was aware of the $18,000 consulting fee or any of the other fees defendants received until after closing when they received the closing documents, including the HUD-1, in the mail.

Almost every statement made to plaintiffs about the value of the Marianna House and the rent-to-own scheme involved material misstatements by defendants intended to create false impressions. The Maidas, relying on these misrepresentations, authorized the closing

on the Marianna House, allowed defendants to handle the closing for them, and allowed defendants to collect rent and remain responsible for taxes and insurance. The consulting fee was paid to Vision Group, and deposited into another Regions Bank account owned by Vision Group, which was administered in the same manner as the other Regions accounts.

There was never any written obligation binding the tenant to purchase the property, or binding Vision Group to obtain financing for it.  The only written documents  were a lease agreement entered between the tenant and Vision Group, the closing documents, a deed, and a mortgage in favor of the Maidas' lender.

Vision Group did not  pay the mortgage held in the Maidas' names on at least five occasions in the year following the closing.  The mortgage was $712.95 per month, thus creating an arrearage of $3,564.75.  What is even more damning is that Vision Group failed to pay the mortgage on several occasions in which the tenant actually paid its rent in advance. Vision Group also failed to timely pay real property taxes in 2007 totaling $235.54. Vision Group also allowed the property insurance to lapse within that first year.  Replacement insurance was purchased for $519.80. Of course, during the period of lapsed insurance, a tree on the Marianna House property fell and destroyed a shed on the neighbor's property, which has cost the Maida's $2,000 in clean up and has generated a demand from the neighbors in the amount of $8,000 for their property damage.

As with the investment programs detailed above, this transaction was one of many involving various members of the public. In each case, Samantha Sherman and Johnson were

involved in similar real estate closings in which a Vision Group investor purchased real property.  In each case, there was a consulting fee.  In these cases, the mails, telephones and wires were used.

F.    Battery Street House

In March, 2007, defendants (with the exception of Johnson, who was no longer associated with Vision Group) attempted to induce plaintiffs to purchase a different house. This house is located on Battery Street in Little Rock (the "Battery Street House") and was to be financed and managed in the same manner as with the Marianna House except that Vision Group already owned the Battery Street House.  Vision Group had purchased the house for $29,000 and Samantha Sherman offered to sell the house to the Maidas for $180,000. Defendants concealed the purchase price and value of the Battery Street House from plaintiffs and obtained plaintiffs' conditional  assent to purchase the Battery Street house.  A copy of the signed offer and acceptance is attached as Exhibit "J" to the Complaint.

Plaintiffs received notice that a mortgage application listing the Maidas as owners-operators was sent by  Samantha Sherman via telefax to US Bank in July, 2007.  This was the case although defendants were aware that the Maidas did not intend to occupy the property. The Maidas noted a number of other material inaccuracies in the mortgage application including their income.  Indeed, the Maidas were alerted to a forged draft tax return prepared by a Vision Group.    The Maidas contacted US Bank and were shown the loan application and forged tax returns that were filled out in their names and decided to abandon the purchase.

Defendants then began attempting to persuade the Maidas to explore unconventional financing, including suggesting to the Maidas that they finance the down  payment for the Battery Street House on a credit card, and suggesting ways to exaggerate their income.

The Maidas did not purchase the Battery Street House. Rather, they requested that the defendants return the $25,000 they invested in the $25K investment program.  They also requested that the defendants give back their $3,000 due to the inactivity of the VGRT,  Inc. REIT. They also demanded the money spent for credit repair and the damages from non-payment of mortgage payments on the Marianna House.  Defendants have refused these demands.

## V.  DISCUSSION

A.    <u>Common Law Misrepresentation</u>

The evidences clearly shows that defendants engaged in numerous misrepresentations and that plaintiffs justifiably relied on defendants' misrepresentations.  The evidence also support plaintiffs' claim that this resulted in damages to the plaintiffs.

In their first five causes of cation, plaintiffs allege misrepresentation regarding defendants' actions surrounding the credit repair program, the $25k investment program, the purchase of the Marianna House, the VGRT, Inc. REIT, and the attempted fraud regarding the Battery Street House.  The Maidas, collectively, are the claimants in each cause, except that Maida, Inc. was the investor in  the $25k investment, and Mr. Maida was the sole purchaser of the Marianna House.

To prove fraud in Arkansas, plaintiffs must establish: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Brennan v. Wadlow*, 372 Ark. 50, 54, 270 S.W.3d 831, 834 (2008).

As discussed above in the factual background, the record is replete with false statements made by defendants to induce plaintiffs to participate in their schemes.  The evidences supports plaintiffs' contention that they justifiably relied on defendants'

misrepresentations.  The evidence also support plaintiffs' claim that they suffered damages.

Joint and several liability can be imposed in cases like this, where the parties are acting in concert.  Ark. Code Ann. § 16-55-205.  "'[A]cting in concert' means entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively take part in that intentional tort."  Ark. Code Ann. § 15-55-205(b)(1).  The evidence also reveals that each individual defendant acted with at least one or two other individual defendants on each of the five instances of fraud, and that the actions of defendants were part of a continuing plan to commit fraud.   Indeed, the court has stricken Samantha Sherman's denial to paragraph 76 of the complaint which alleges that defendants deliberately acted in concert and each had personal participation in one or more of the individually detailed tortious acts.  Thus, defendants are jointly and severally liable for the damages plaintiffs sustained as a result of  defendants' fraudulent misrepresentation.

B.     Violation of Federal Securities Laws

Defendants violated Section 10 of the Securities Exchange Act of 1934, and plaintiffs are entitled to rescissory damages, attorneys' fees and costs.  15 U.S.C. § 78j.  *See Randall v. Loftsgaarden*, 478 U. S 647, 662 (1986) (rescissory recovery may sometimes be proper on a § 10(b) claim).

The $25k Investment program and the VGRT REIT investment constituted the "sale" of "securities" from an "issuer" as defined by 15 U.S.C. § 77b(a) (Securities Act of 1933), and 15 U.S.C. § 78c (Securities Exchange Act of 1934).  Under Section 10(b), it is unlawful for

any person, "directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). Section 10(b) is not limited to a purchaser or seller of securities, but rather "reaches any deceptive device used 'in connection with the purchase or sale of any security.' " 15 U.S.C. § 78j(b). Rule 10b-5, adopted by the SEC pursuant to its rulemaking authority, states that "[i]t shall be unlawful for any person, directly or indirectly,"

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security

17 C.F.R. § 240.10b-5. Rule 10b-5 is coextensive in scope with Section 10(b). *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994): *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976).

In order to sustain a securities fraud claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, plaintiffs must show: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re K-tel Int'l, Inc., Sec. Litig.*, 300 F.3d 881, 888 (8th Cir.2002). Here, the record establishes that defendants made

false and material statements in connection with the sale of the REIT and the investment program.

C.     Civil RICO

Defendants are subject to civil liability under RICO, 18 U.S.C. § 1961 *et seq*,.  Civil liability under RICO, 18 U.S.C. § 1961 *et seq*, arises where there is (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity.  *Bowman v. Western Auto Supply Co.*, 985 F.2d 383, 386 (8th Cir. 1993).  RICO liability should be found where a plaintiff demonstrates that the defendants have combined to form an ongoing enterprise as defined under 18 U.S.C. § 1961(4) with the purpose of committing unlawful activity, and commit two or more predicate acts of mail fraud or wire fraud as defined by 18 U.S.C. §§ 1341 or1343.  Defendants Samantha Sherman and Johnson claim that plaintiffs cannot establish a RICO violation.

RICO defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity" occurring within certain time frames. 18 U.S.C. § 1961(5) (1988).  The statute includes as "racketeering" activity wire fraud and mail fraud.  18 U.S.C. § 1961 (1)(a).  "Pattern" requires proof "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original)   A relationship between predicate acts exists when the acts are similar in method, purpose, and result. *First National Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir.1991). Continuity may be demonstrated "by

proving a series of related predicates extending over a substantial period of time." *H.J.*, 492 U.S. at 242. Continuity also exists if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business," thereby constituting a threat of causing continuous harm in the future. *Id.* at 242-43.

Plaintiffs allege that defendants committed the predicate acts of wire fraud and mail fraud.  Defendants do not dispute that they used the mail and telephone to conduct their activities.  The evidence establishes that defendants spoke on the telephone with plaintiffs and used the mails to give misleading and fraudulent information.

It is clear that the predicate acts had the similar purpose of inducing plaintiffs and others to participate in fraudulent schemes that involved alleged credit repair and phoney investment opportunities.   "The similarity of method, purpose and result clearly establish a 'relationship' between the predicate acts."  *Hollingsworth*, 931 F.2d at 1304. There were at least ten other investors in the $25k Investment program, none of whom received the guaranteed 10 percent return or a full return of their $25,000.00 investment.  Several persons were induced to invest in the VGRT REIT.  The predicate acts were not isolated incidents, but involved attempts by defendants over several years to recruit people to participate in the fraudulent schemes.

For these reasons, the defendants' conduct constituted a "pattern of racketeering activity."

A RICO enterprise must have  "(1) a common or shared purpose; (2) some continuity

of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering."   *Atlas Pile Driving Co. v. DiCon Fin. Co..* 886 F.2d 986, 995 (8th Cir. 1989).  The focus "is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense."  *Diamonds Plus*, *Inc v. Kolber*,  960 F.2d 765, 770 (8th Cir. 1992).

Defendants published promotional material and spoke at various meetings and seminars to encourage people to participate in their financial wellness program.  They enticed potential participants into contacting them about credit repair. Defendants used that contact information to further induce persons to participate in their investment opportunities. They developed promotional material, including an offering memorandum, to encourage persons to invest in their fraudulent investment projects.  Their enterprise involved a number of businesses and purported "products" including credit repair, real estate investment, insurance, accounting, and investment advice.  They had an office, with office personnel, to operate their sham businesses, including a customer call center with a customer relations manager. Defendants maintained several bank accounts from which they would pay business and personal expenses.  Putting the predicate acts aside, the court finds that the "enterprise had an on-going structure and that its members were not engaged in sporadic criminal activity." *Atlas Pile*, 886 F.2d at 996.

Participation in the operation or management of the enterprise is required.  In order to participate, directly or indirectly, in the conduct of such enterprise's affairs, "one must have

some part in directing those affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993). An enterprise may be "operated" or "managed" by others "associated with" the enterprise who exert control of the enterprise. *Reves*, 507 U.S. at 185.  Plaintiffs need only prove that defendants had some part in the direction, not control of, the enterprise's  affairs. *United States v. Darden*,  70 F.3d 1507, 1518 (8th Cir. 1995).

There is no doubt that the individual defendants directly participated in the affairs of the enterprise.  They, in fact, admit to being the organizers and implementers of the enterprise. They solicited victims, including plaintiffs, to participate in their various schemes. Defendants presented themselves as reputable financial advisors, and then took every step necessary to defraud plaintiffs.  They developed the promotional materials for the financial wellness program.  They worked to facilitate the purchase of the Marianna and Battery Street homes.  In sum, the court finds that defendants have violated RICO.  Under the statute, plaintiffs are entitled to "threefold" damages and costs, including reasonable attorney's fees. 18 U.S.C. § 1964(d).

D.      State Statutory Claims

Plaintiffs bring claims for violations of th the Arkansas Credit Services Organizations Act, Ark. Code Ann. §§ 4-91-101 *et seq.,* the Arkansas Securities Act, Ark. Code Ann. §§ 23-42-101 *et seq*., and the Arkansas Deceptive Trade Practices Act (ADTPA), Ark. Code Ann. §§ 4-88-101 *et seq*.

*1. Arkansas Credit Services Organizations Act*

Defendants violated the Arkansas Credit Services Organizations Act.  Ark. Code Ann. §§ 4-91-101 *et seq.*

By offering to repair credit, Vision Group was a "credit services organization" as defined by Ark. Code Ann. § 4-91-102(2)(A).  Plaintiffs are "buyers" as defined in Ark. Code Ann. § 4-9-102(1).  Under Ark. Code Ann. § 4-91-106(a)(1), defendants were prohibited from charging the Maidas for the services for which they contracted unless defendants posted a bond of $10,000.  Defendants violated this section by not posting bond and by charging plaintiffs prior to full and complete performance of the services they said they would perform.  Additionally, defendants failed to advise plaintiffs of the right to rescind required by Ark. Code Ann. § 4-91-109.

Section 4-91-105 provides that:

> (a) Any buyer suffering damages as a result of a violation of this chapter by any credit services organization may bring any action for recovery of damages. Judgment shall be entered for actual damages, but in no case shall the amount be less than the amount paid by the buyer to the credit services organization, plus reasonable attorney's fees and costs. An award may also be entered for punitive damages.

Plaintiffs are entitled to the $1,698.00 they paid for the "credit repair services" along with interest, attorney's fees, and costs.  Plaintiffs do not seek punitive damages.

## 2. *Arkansas Securities Act*

Defendants violated the Arkansas Securities Act.  Arkansas Securities Act, Ark. Code Ann. §§ 23-42-101 *et seq*.  As found above, defendants made untrue statements of material facts in the selling of the $25K Investment and the VGRT REIT, which violates Ark. Code

Ann. § 23-42-106(a)(1)(B).  Therefore, defendants are liable to plaintiffs for the consideration

paid for the security, along with interest at the rate of six percent per year from the date of

payment, costs and reasonable attorney's fees.  Ark. Code Ann. § 23-42-106(a)(1).

### 3.  Arkansas Deceptive Trade Practices Act

Defendants violated the Arkansas Deceptive Trade Practices Act.  Ark. Code Ann. §§

4-88-101 *et seq.*

The ADTPA prohibits certain deceptive and unconscionable trade practices including

making false representations as to goods or services, and engaging in other false or deceptive

acts or practices.  Ark. Code Ann. § 4-88-107.  As discussed above, defendants made false

representations about the characteristics and benefits of the services and goods they offered.

Their schemes involving the Battery and Marianna houses clearly fall in the catch all category

of "unconscionable, false, or deceptive acts."  Ark. Code Ann. § 4-88-107(a)(10).  *See State*

*ex rel. Bryant v. R. & A. Inv., Co.*, 336 Ark. 289, 297, 985 S.W. 2d 299, 303 (1999) (catch-all

provision of ADTPA is constitutional).

Plaintiffs are entitled to their actual damages and reasonable attorney's fees as a result

of the damage they suffered for defendants' violation of the ADTPA.  Ark. Code Ann. § 4-88-

113(f).

## VI  CONCLUSION

Because summary judgment is granted in favor of plaintiffs on all of the claims, as set

forth above, the court will not address plaintiffs' remaining claims.  Pursuant to the findings

above, summary judgment is granted for plaintiffs and against defendants as follows:

1) arising out of the "credit repair program," in favor of Dominick and Dorthy Maida against all defendants, jointly and severally, in the amount of $1,698.00 plus prejudgment interest at the rate of six percent from September 20, 2005 through entry of judgment, trebled pursuant to RICO;

2) with regard to the $25,000.00 investment, in favor of Maida, Inc. jointly and severally against all defendants, in the amount of $25,000.00 plus interest at the rate of six percent from May 12, 2006, trebled pursuant to RICO;

3) arising out of the Marianna House purchase, in favor of Dominck Maida, and jointly and severally against all defendants, in the amount of $15,733.65 initially received by defendants as "commission," and prejudgment interest at the rate of six percent from September 24, 2007, through judgment, trebled pursuant to RICO;

4) arising out of damages suffered arising from the Marianna house purchase, in favor of Dominck Maida and against all defendants jointly and severally, in the amount of $8,320.00, trebled pursuant to RICO;

5) arising out of the VGRT REIT, in favor of the Maidas, and against all defendants jointly and severally, in the amount of $3,000.00 plus prejudgment interest at the rate of six percent per annum since January 16, 2007, trebled pursuant to RICO;

6) arising from the Battery House actions, in favor of the Maidas and against all defendants except Jerry Johnson, in the nominal amount of $1.00, trebled pursuant to RICO;

7) $1,170.00 in costs and fees previously awarded by the court against defendant Samantha Sherman; and

8) with respect to each defendant, reasonable costs and attorney's fees to be submitted by application by plaintiffs within 10 days of entry of the judgment, along with post-judgment interest at the statutory rate.

All pending motions are denied as moot.


IT IS SO ORDERED this 11th day of August,  2009.


_____
UNITED STATES DISTRICT JUDGE